THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ R. ELIZA COLÓN, Defendant and Appellant.

No. CR-67-104.      Decided January 25, 1968.

*E. L. Belén Trujillo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Lolita Miranda, Assistant Solicitor General,* for The People.

PER CURIAM: The questions in issue in this case are:

(1) the sufficiency of the evidence of the state of intoxication of appellant, José R. Eliza Colón, which gave rise to his conviction for violation of § 5-801 of the Vehicle and Traffic Law (9 L.P.R.A. § 1041(a)); (2) the refusal to permit the expert physician to give his opinion as to the state of a person who has a content of 0.12 by weight of alcohol in the blood, and as to his opinion of what is or is not a hypothetical question; and (3) the fine of $200 imposed on him and in its default up to 90 days in jail, and the suspension of his license for one year.

Errors 1 and 3.—The oral evidence on the state of intoxication of appellant at the time of the collision between the vehicle driven by him and another driven by Miguel Ángel Sierra, at the intersection of Laurel Avenue, of Lomas Verdes, along which the latter was traveling, and Bellísima Street, from which appellant intended to cross the avenue, was the following:

(a) Testimony of Miguel Ángel Sierra: After the collision, both alighted from their vehicles to talk; he noticed that appellant was drunk because "He staggered and was nervous . . . he spoke with a certain strong tone . . . . I could not perceive any smell [appellant's breath] because I cannot perceive smell, I have a defect. . . ." On cross-examination he said that:

"MR. J. MUÑIZ:

Q. What were the conditions there, where the accident occurred, how was the pavement?

A. Honestly speaking, from the direction he came there were some depressions which waved like this, and then where he detained the automobile the ground, the condition of the highway was a bit rocky and with. . . .

JUDGE:

Q. A bit what?

A. Rocky and with holes.

MR. J. MUÑIZ:

Q. That is, the highway there was being repaired?

A. They had not begun yet. . . .

Q. But it was rocky?

A. It was not in good condition.

Q. So that a person could walk normally along there?

A. Well, that depends on the physical condition of the person.

Q. But a person could walk by the highway which was, as you say, full of holes?

A. Well, yes, may I speak? I could walk in those conditions.

Q. And the rocks and holes which were there?

A. Well, I could walk in those conditions, perhaps another person could not.

Q. But you could not walk there as you walk here?

A. Of course not, I have to be more careful.

Q. It is more difficult to walk there than here, or there?

A. Well, it is a place in which the person has to take care not to fall, it is a place full of rocks and holes. . . .

Q. It was not like this there?

A. No, it is more difficult.

MR. J. MUÑIZ:

Q. Well, now, when questioned by the prosecuting attorney, you testified that you noticed that he staggered?

A. Yes.

Q. You could not perceive any smell?

A. No.

Q. That is, you cannot assure the court that he smelled of liquor?

A. Because I could not perceive that.

Q. And that he was nervous?

A. That I can assure.

Q. And on the ground of those two observations, you affirm that he was in a state of intoxication?

A. Correct.

Q. On those two observations exclusively, is that correct?

A. I say, that on the ground of those two observations I reached that conclusion.

Q. Listen, over there in that place, if a person alights from his car and the highway is full of holes, does it give the impression that he staggers, can that happen?

A. It can happen.

Q. Did you have, in addition to that day and on other occasions, the opportunity to talk with Eliza Colón or speak to him apart from the discussion of that night, etc., could you judge Eliza Colón's character?"

" . . . . . .

A. In my opinion, the character of the gentleman at that moment was, truly, very nervous and strong, not to the extreme of becoming aggressive, but one can say that he revealed certain anger.

Q. But at no time was he disrespectful?

A. He did not say any obscene words.

Q. Was he only nervous and defending his opinion in discussing with you, that you had hit him, but he did not say obscene words?

A. As to that, the answer is no."

(b) Testimony of Manuela Pereira, who accompanied Sierra and suffered injuries as a result of the accident:

"Q. Were you able to observe the defendant?

A. Yes.

Q. Did you notice anything about him?

A. I noticed he was drunk.

Q. Tell the judge herein your . . . on what you deem . . .

A. I noticed he stuttered and staggered, he did not stand up straight, but staggered.

Q. What else did you notice?

A. His eyes were red.

Q. How did he speak?

A. He spoke so rapidly, in such a manner . . . he seemed to be, really, let's see, this . . . he spoke badly.

Q. With anger or . . .

A. With anger."

On cross-examination she said that although appellant's eyes were red at the time of the trial "but they are straight now," and that at that moment he was not in a state of intoxication.

(c) Testimony of Francisco Pizarro, who was standing close to the scene of the accident and saw it:

"A. . . . I began to run to see what was happening and I asked her, what is the matter lady, and to the gentleman also, and that gentleman [appellant] came up from there to here, furious, and he was drunk, you know . . . .

Q. Was he drunk?

A. I can tell you, you know, he was staggering back and forth."

(d) Testimony of Tomás E. Padilla, state police who came to the scene of the accident a little after it occurred:

Q. Were you able to observe Eliza Colón?

A. Yes, and upon observing José R. Eliza Colón I was able to notice that he was in a state of intoxication.

Q. Why do you say that he was in a state of intoxication?

A. José R. Eliza Colón was in a state of intoxication because he staggered when he walked; when he spoke he did so as if his tongue were heavy, his breath smelled of liquor, his eyes were reddish, and his hair was uncombed.

Q. Did you ask him for anything at that moment?

A. I asked him whether at the scene of the accident he knew somebody who could drive his automobile up to the police station, since he was in a state of intoxication and could not drive the automobile up to the Bayamón headquarters.

Q. And what did he do?

A. Well, he went with me in the police car."

He added that they were at the police station from nine-thirty, some 20 minutes or a half hour. Then they went to the Bayamón Health Center; since he did not want his blood sample to be taken, they tried to obtain a sample of urine, but in trying and not succeeding in giving the sample for more than one hour, he let his blood sample be taken about 12:30 at night. From there they took him to the justice of the peace. He said that:

"A. The gentleman's [appellant] conduct was violent on some occasions, at times he was silent, and looking around desperately, he became desperate, suddenly he started speaking, from the moment of the accident that was his conduct because at the moment of questioning him, of investigating the accident, police-

man Martínez asked him if he had stopped at the stop sign, to see more or less how the accident had occurred, to which he answered that policeman Martínez and the police were prejudiced against him, no matter what he did, the police was already prejudiced against him."

On cross-examination he said that the uncombed hair could be a characteristic of being in a state of intoxication; that the smell of liquor may or may not be another characteristic of said state, and that staggering many times is. As to appellant's eyes, the cross-examination was the following:

"Q. Please, defendant . . . . Look at defendant's eyes, how are they?

A. They are a bit reddish.

Q. And now, is this gentleman in a state of intoxication?

A. No, sir, not now.

Q. Not now?

A. No.

Q. But his eyes are reddish?

A. A bit, not like that night.

Q. But aren't you saying that they are reddish?

A. A bit.

Q. A bit reddish?

A. A bit reddish.

Q. Therefore, the reddish color is a question of degree, so that more redness means a greater state of intoxication?

A. It may be."

As to appellant's conduct, the policeman testified on cross-examination, thus:

"Q. Did this gentleman speak to you in an obscene manner, with obscene words, did he tell you any obscene word at any time?

A. He did not say any obscene words at any time, but he spoke in a violent manner.

Q. Listen, I continue asking . . . . He did not say any obscene words to you at any time?

A. None, at no time.

Q. Did this gentleman attack you physically at any time?

A. Not physically.

Q. He never attacked you?

A. No, he never attacked me.

Q. Therefore, he did not attack you physically or with obscene words?

A. No, sir.

Q. You testified that he was violent?

A. Yes.

Q. That is, what you mean by a violent manner includes two things, to say obscene words and to attack you, that is what it includes, your definition of violence includes, that is, does not include . . . .

A. Well . . . .

Q. The word violence, you said he acted violently?

A. Violently.

Q. You are telling me that he did not say any obscene words, nor did he attack you, that is, he did not abuse you by deed or words? What does the word violence mean to you?

A. He did not say any obscene words to me, but he challenged me in an offensive tone of voice.

Q. Listen, sir, did this gentleman here claim that the accident was not his fault but the other's fault, did he allege that there?

A. He alleged it from the time I made the investigation.

Q. How did he support that thesis, passively, with conviction and force, in what way did he support that thesis?

A. With conviction and force.

Q. That is to say, if I sustain something and say so with conviction and force, is that being violent?

A. The violence I am referring to . . . ."

(e) Dr. Fragoso testified for the defense, he took the blood sample, the chemical test which gave zero point twelve percent of alcohol in the blood. This witness testified that:

"A. As to conduct, I have nothing against him, since at no time was he disrespectful, he behaved himself very well.

Q. Did you notice anything abnormal in him, doctor?

A. Nothing in particular.

Q. Would you say his conduct was normal or abnormal?

A. Normal."

The objections of the prosecuting attorney to the following questions made by the defense to this witness were sustained:

"Q. Tell me, doctor, as a physician and according to your scientific knowledge, what opinion do you have about a person whose blood sample is taken, and the chemical test reveals zero point twelve percent of alcohol in the blood . . . .

Q. Tell me, doctor, could you explain to this court your opinion on alcohol percentage in the blood?

Q. Doctor, what would be your opinion on a percentage of less than fifteen of alcohol in the blood?

Q. Doctor, if a person after receiving a chemical test, has a blood sample of point fifteen percent, what would be your medical interpretation of that percentage?"

The trial court ruled, in sustaining these objections, that if it involved a hypothetical question, "let us make the question as a hypothetical question is made."

(f) Miguel Martínez Bonaparte, who accompanied appellant in his vehicle at the time of the accident, testified for the defense. He said that after the accident, Sierra told appellant that he was going to fix his car and at that moment the police arrived and arrested appellant and took him with them; that the latter's conduct was good; that he was not staggering. On cross-examination he said that appellant and the witness were in the latter's house from 4:30 or 5:00 in the evening, till eight or eight thirty, and during that time they drank four or five bottles of beer.

(g) Appellant testified in his own defense that when the police arrived he was blamed for the accident and:

"I alleged, I told him it was not my fault because he had not been there to say that it was my fault, because he told me that he had the right of way, because it was the main highway,

and that I was not supposed to be driving there, and I told him that I was going to the garage and I had to cross the avenue, and then the policeman told me that I was drunk; I told him that he was already prejudiced against me, that if he had arrived with that attitude, he could not judge me correctly because he did not know what had happened there, and then he called policeman Padilla and then he said I was drunk, and Padilla told him that I had to give him my car key immediately, and I got into the police car with him, I think another policeman took my car to the police station."

The aforementioned § 5-801, in its paragraph (b) (2), provides that: "If there was at the time of the analysis in excess of five (5) hundredths of one (1) percent but less than fifteen (15) hundredths of one (1) percent by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered jointly with other competent evidence in determining the guilt or innocence of the defendant."

In *People v. Galleti Rodríguez*, 88 P.R.R. 275, 278 (1963), reference was made, without comment, to the testimony of a chemist to the effect that: "a person with 0.15 is in a state of intoxication. With less than that the person may or may not be in a state of intoxication." It was then said that it depends on the persons who saw him.

The fact as to whether appellant was excited or calm, and whether or not he said obscene words, is not conclusive—it can be one of the factors to be considered. *People v. Díaz Torres*, 89 P.R.R. 704 (1963).

■ Proof that a person seems to be dazed, spoke incoherently, smelled of liquor, and staggered, in addition to the chemical test of the blood, is sufficient to establish his state of intoxication. *People v. Santos Vázquez*, 89 P.R.R. 86 (1963).

In *People v. Vélez Ruiz*, 89 P.R.R. 51 (1963), we said that when we have reversed convictions for the offense of

driving motor vehicles in a state of intoxication, exceptional circumstances have been present.

■ In *People* v. *López Rodríguez*, 88 P.R.R. 459 (1963), we said in a case similar to the one we are considering, that when the evidence is conflicting, the evidence for the prosecution being sufficient to support the conviction, we shall not interfere with the sound discretion of the trial judge in weighing the evidence, nor shall we substitute our criterion for that of the former, except under circumstances showing that the trial court acted with manifest error, prejudice, or partiality.

This case is different from that of *Galleti, supra,* because in the latter the evidence of the state of intoxication is of greater weight and more precise, not only with respect to the condition which appellant was in at the time. of the accident, and later at the hospital and before the justice of the peace, but because appellant had been drinking beer for four hours before the accident.

■ From the foregoing, we conclude that there was enough evidence to justify that the trial court determined that at the time of the accident appellant was driving his vehicle in a state of intoxication, the degree of the evidence being such that we do not feel justified in disturbing the weighing thereof made by the trial court, not only as to the conviction itself, but also as to the penalty imposed.

■ Second Error: The assignment concerning the nonadmission of hypothetical questions lacks merit because the questions involved were not really hypothetical, since a factual basis had not been previously established thereof, for example, the physical and emotional state or condition of the person, his age, weight, and when and what amount of food he had eaten.

Therefore, the judgment rendered in this case by the Superior Court, Bayamón Part, on June 8, 1965, will be affirmed.